In our last case of today, numbers 14-2086 and 14-3694, Ringgold v. Keller et al., Ms. Krupa, and Mr. Merkley? Merichli. Merichli, okay, thank you. You've been before and I keep mispronouncing, I'm sorry. I remember, I know how to pronounce it. Yes. Because I did so, it's a Turkish origin name. Right. That I knew from the last time. Thank you, Your Honor. My name is Charity Krupa. I represent the appellate, Trevor Ringgold, and I would like to reserve four minutes of rebuttal time. That's fine. I know that we are slated to review the CD. I wasn't sure if the court wanted to do that. Yes, why don't we go ahead and do that first. Okay. I'm not sure if the court wants to watch it alone or with my narration. You can do your narration, then Mr. Merichli can also give his narration if you'd like as well. Thank you, Your Honor. And again, when it begins, this is in the dining hall at SCI Fayette. My client will be coming, Trevor Ringgold will be coming up from this area. Right here. So he's jumping the line right there? Correct. And you'll see the officers approaching to him, motioning him to exit. He turns to go. There's words said between the two of them, obviously. There's no sound to this, but you can hear him holding his hand in his ear. The guard asks for him to come out of the railing. Before he's even out of the railing, the officer initiates striking him multiple times. And that officer is Officer Keller? Yes, that's Officer Keller. This is Officer Zuroski. Stop right there if you would. Yeah, let's identify the other two. Who are the other two officers right there? The other one is Officer Zuroski, who ends up being on the bottom of this pileup. And you really can't see. Here's Zuroski, and here is Mirai. So Zuroski ends up being on the bottom of the pileup. Mirai, if you keep an eye on him, though, you can see him throughout the video. Of course, until the video gets manipulated so that it's sky high. But there is one clear, distinct punch from this officer. One thing to note, too, is these are the three officers that are stationed in the dining hall during this incident. No officer who witnessed this event will admit that they saw any officer strike Trevor Ringgold, which is very interesting and incredible because when you watch this throughout, Officer Keller continuously strikes him. So the fact that these two officers would then say that they never saw Keller strike him or that they didn't strike him, it's just not believable. So to start from here, if you watch again, Zuroski's going to end up on bottom. Mirai ends up grabbing Mr. Ringgold as well. You'll see Keller go to the head area of the plaintiff. And again, if you watch Mirai, there's a visible, distinct punch. So Mirai, the two officers take him down. Keller goes to the head. But if you watch Mirai... So that's Keller hitting him in the head. Keller hitting him in the head. And Mirai, see there's distinct punches by Mirai as well. This is when the camera's manipulated so that we can no longer see what the corrections officers are doing. When it comes back, the white shirt is Defendant Wright. And if I can go back for one second, there is Stoner, Officer Stoner. Go back just a little bit further. Well, Officer Stoner does approach and gets Officer Keller. And when I say gets Officer Keller, that's Officer Stoner there who grabs Keller and begins to separate them. Now, I commend his actions for doing that. I think the first two corrections officers should have taken that approach, particularly when they saw the altercation start. Where I take a difference with correction officer Stoner's action, then, is that Stoner gives in his statement immediately after this that he saw no officer strike the plaintiff. And again, he had to have seen Officer Keller strike him because Officer Keller continuously was plummeting him to the head at the point that CO Stoner broke them up. So Stoner didn't strike anybody? No, he did not. And Stoner was the one who tried to get Keller off? Well, and if I may back up just a little bit, Your Honor, when you say that Stoner didn't hit anybody, my client knows distinctively that Keller assaulted him. But he said while he was in the midst of this power-up that multiple officers were striking him, kneeling and kicking him. I understand that. But we have the video, and we're watching what a jury would watch. During the course of the six or seven seconds when the camera shot up to the ceiling, we don't have that portion. So I think that in all fairness, I think that CO Stoner's role there was, at least from what we initially see on the video, was to remove Officer Keller. I think, though, that his involvement in this case becomes that of a co-conspirator when he lies immediately after the incident to cover up for his corrections officers. Go back to Zosky. Was he on the bottom the whole time? Essentially, yes, Your Honor. Not essentially. Was he on the bottom or was he? He appears to be on the bottom of the power-up. You can't identify what he's doing with his arms or legs. At the same time, my client indicates he's being kneed and kicked by the officers in the power-up. So I think that there's, again, Zosky takes the same approach in his statements and his depositions that he never saw Officer Keller strike the inmate, that the inmate was the aggressor. And I think then that you have a credibility issue for the jury to decide what Zosky's role was. So Zosky's here. Mariah takes him down. But you can't see Zosky. So Zosky could have been kneeing him, kicking him, doing whatever. Zosky could have been doing a number of things, but you've got to prove that Zosky did something. And I think given the fact that his false statements afterwards shows a consciousness of guilt and that it would appropriately be a decision for the jury to make. Well, we'll hear from the other side on that particular issue, I'm sure. And, again, this is an incident where there was significant harm to the inmate involved in this matter. He had to receive stitches on his cheek. He has damage to his eyesight. His teeth were chipped. He has some numbness in his mouth. He had been, prior to this incident, was suffering from PTSD, and his medication had to be altered. Basically, his medications had to be changed and upped as a result of this incident. What evidence do you have with regard to a genuine issue of material fact on Ringgold's claim against Coleman? With respect to the Superintendent Coleman, in his deposition, the superintendent testified at great length that at a dining hall with this many inmates being fed, that a minimum of four COs needed to be working the meal shift. He went on and cited in the record, he went on to state that that was for officer security and inmate security. However, the COs involved in this, particularly, I believe, have cited Lieutenant Wright's deposition that for years it had been the practice and policy at this particular institute that only three COs would be working the morning shift. So my specific argument with respect to the superintendent is that he failed to supervise and train, particularly at this institution, when he knew that there needed to be a minimum. What difference here would it have made if there were four instead of three? In this instance, CO Keller testified at great length in his deposition that he believed that he was trained, that he felt threatened, and he believed that his training permitted him to act this way in this instance. I think if there had been a fourth security officer, perhaps he may not have felt so threatened. And I believe that that's where the difference would have been made. With respect to Lieutenant Wright as well, I think that his involvement in the supervisory role is twofold. I think that he should have been aware that there should have been four COs stationed in the dining hall. There were not. He also, Wright makes false statements, again, that he didn't see any officer strike the inmate, and I believe that that was the case. What was Wright when this all began, do you know? He was not in the dining hall when it began, but you can see from the video. It looks like he ran in and just tried to break it up. That could be one interpretation for the jury to decide. But on the other hand, I think that, and I hesitate to play the video yet another time, but I think that given the timing, that there was, that there, that there was, it was more likely than not that he still saw Keller striking the inmate in the head. And the other officer, you say, that was, got some punches in, at least we can see from the video, was Zosky? No, I'm sorry, it was Mirai, M-A-R-I. M-A-R-I, okay. Yes, Zosky was the one on the bottom. Who was the officer that was manning the video? That, you know, I wish I knew that. The information that I received was that there's multiple people that can control that video. Basically, there's several cameras in the dining hall. The one that filmed was a pan camera in the center of the room. It was very high ceilings. My understanding from one of the depositions is that people in main control and security all had access to that camera. I do think that it's very suspicious that it conveniently shifted in the sky during this altercation, particularly when all the other officers were coming on scene, too. It almost would appear, the jury, I think, would be free to believe that as soon as the superiors were alerted that there was an incident was when the cameras went sky high. Was there any testimony that was taken or evidence that would shed any light on why that was done? The explanation given by the DOC, and I can't recall specifically whose deposition it was, was that because there were multiple people that had access to, basically my understanding is it's a joystick or some type of joystick-like controller that manipulated the camera. The explanation that was given was that if two different people were trying to move it at the same time, that could have caused the video. But I believe, given the fact that an officer was terminated, it's not part of the record, but my understanding is that's still pending on a union appeal. But given the fact that the camera was manipulated, that all of these officers, none of them will admit that they saw Officer Keller strike them. And that is very disturbing when you see that video where it was repeated strikes. But not one of the corrections officers to admit that they saw Defendant Keller indicates that there is a custom and policy of covering up this type of unconstitutional behavior within the DOC. Thank you. Thank you. Thank you, Mr. Richley. Good afternoon. May it please the Court. My name is Kamal Alexander Richley, and I represent the Appalachians in the present case. May we have the video played once more? Sure. Go right ahead. Is there? Okay. Thank you. Okay. Now, I'm somewhat alert to the time signals down at the bottom. As you see, this begins shortly after 731 in the morning. Now, here we are. Here's Mr. Ringel. He's been confronted by Mr. Keller, Corrections Officer Keller, who apparently beckons and invites him to come over. At this point, we have Keller's assault. That's roughly 21, second 21. Now, then after that, we have... Could you stop it for a second? Yeah. You see, I'm not sure how to do that. Is this the pause down here? Okay. Down here, I see. I see down here. Go back up to where it was and hit the X out on the top right-hand side. Top right-hand side? All the way up in northeast. There you go. Okay. Now, how do I get it to, excuse me, Your Honor, but how do I get it to go back? May I? This group will show you there. Yeah, okay. If you could put it on the little round thing, you can go back as far as you want. Okay. That's what I'd like to do. I see here. Let's take it just a little more slowly here. So, I mean, did Keller put down his keys or whatever he had? There's no question. He was going to pop him. We don't represent Keller. He's been denied immunity and representation. Now, right here, we have the initial confrontation with Mr. Ringgold. This is Keller. This is Ringgold. Right. Now we go on. I think it starts at 09, it looks like. Yes, and I think it's right around here. I'm sorry. He beckons him. He throws down his communication device, and he just starts hitting him without provocation. No. That's at 20 or 21. All right, now this is Zosky, and as we've seen a little bit earlier, Zosky's right up here. He's looking on as the two are in contact. This is Zosky. Now, here we go again. Now what you're going to see is Zosky, at this point, when he starts hitting him, Zosky makes his call for help. He comes around, and he grabs him around the waist. Now, at that point, Mirai comes running in at this point and tackles him. See if we can get back on that a little. Okay, there they are. Go ahead, Tony. Oh, I thought Zosky was the one. There's Keller. Now, here comes Zosky. Zosky grabs him around the waist. Now, here comes Mirai. You see Mirai here? Mm-hmm. Okay, here comes Mirai. Mirai, more or less, tackles him up around the top. Now they're all down in a scrum, and you see Keller jumping over and starting to hit him in the head. But you see Mirai here. Zosky's on the bottom, as my learned opponent said. You see Mirai here grappling, withholding onto Ringgold. Now, this is 32. Now, shortly after this, we'll see Mr. Mirai's arm come up and go down and grab on Ringgold. Wait, let me get this back. Okay, now Keller's wailing around. Now, you see, that's the one move by Mirai. Did you see it? Yeah, that looks like a punch being thrown. It could look like a punch, but the way it was interpreted, I don't think it's a punch, and I'll tell you why. Wouldn't that be a factual issue? I don't think so, because I don't think it looks like a punch. I just think it looks like him. I'm not a juror, but if I were a juror, I might think that's a punch. I see. Well, I might, too. I wanted to point it out to you. Let's see if we can go on. No, I missed it. So there were three officers in the room at the time. Right, there were three officers in the room at the time. Okay, let's see if I can see where. It's roughly after 32. Let's see. There it is, right there. And who's that coming in? Who's the fourth officer? That's Stoner coming in to the rescue, dragging Keller off. Okay, now right before that is where we would have seen the movement of Mirai's arms. There it is. See it? There it is. Did you see that? Yep. That's what my learned opponent says was a punch. We just say it's part of the general grappling, wrestling, grabbing, and one of the reasons is Mr. Mirai does not, as if it were a punch, retract and deliver it again. It's just that one movement. Well, there's a couple of movements, though, aren't there? But they're all, to me, that's the only real definite and distinct one, and that was the one that was pointed out to you by the learned opponent. Well, we don't make findings of fact. No, I understand. So the juries do. I understand, and let's see. Where did I? I lost it. I have to get up to roughly 32. There we are. That's where the camera jiggles. Takes seven seconds. Did anybody find out what happened? My learned opponent was – would you pardon me a second? Sure. My learned opponent was absolutely accurate in telling you what we learned, and that is that there were two areas where there were four joysticks, and the most we could tell – if you come back, if we come back to this, we can see that at some point – it's over now, but at some point when it's jiggling, let's see, be right after this. At some point when it's jiggling, there's a zoom effect attempted. See? Right there. And then – so at this point, what we have is the record reflects that there are eight to ten individuals in two separate locations, the control center and the security office, that have access to approximately four joysticks that can deal with this camera, which is a pan camera in the cafeteria, as you see, without any sound. And the reasonable inference under these circumstances is that someone in one of those two locations tried to manipulate the camera to zoom in and get a better picture, and then just decided when they reached a certain point that that was as good as it was able to get. What about the point that Zosky and Mirai both said that they didn't see what happened? I mean, you've got Mirai and Zosky just standing there. He's looking right at it. Yes. Yes. And others, too. Well, I don't think there's any strong evidence that Lieutenant Wright saw what happened. He came in at the very end. We only see him after Ringgold's down on the ground. Stoner is the other individual. As for Mirai, we don't really know what vantage he had before he intervenes. At the time he intervenes, not only is Keller involved with Ringgold, but by that time, Zosky is hanging around Ringgold's waist. And it's at that point that Mirai comes up from the right and tackles Ringgold in the upper chest portion and pulls everybody down. Zosky ends up on the bottom, as my learned opponent says. Mirai is around the waist at that point with his cap knocked off. We then later see him move his arm in the way we discussed. Meanwhile, while those two men, Zosky and Mirai, are engaged in that manner, Keller vaults up and over them and starts punching Ringgold in the head. At that point, Sergeant Stoner intervenes and pulls Keller off, commended even by my learned opponent. Now, as far as who says they never saw any blows, all of them say they never saw any blows. We don't have any way, though, of saying that there's a conflict on that subject, except insofar as Zosky is concerned, because as you noted and as Judge Ambrose noted, he's looking right at them at the time the altercation takes form, and then he comes in and intervenes. Obviously, Sergeant Stoner must have known because he grabbed Keller and stopped him from doing it. Now, the question is, why is that immaterial? It's immaterial not necessarily to their disciplinary status or toward some other cause of action, perhaps, but it has nothing to do with whether or not they specifically engaged in an unlawful use of force on that date. Are you familiar with, and I realize it's not a presidential opinion, about a court, McDowell, came out in 2010, McDowell v. Scherer. No, I'm not familiar with that. It's at 374F Appendix 288. This is an opinion written by Judge Stapleton. I was on the panel with him, and we witnessed the incident there, which was an extraction of two prisoners who would not go back into their cells, and we allowed that to go forward on an excessive force claim. And I must tell you, having seen that video and this one, this is much more graphic in terms of what went on. For the life of me, I don't know why we would not let this go to a jury similar to what we did in McDowell. Well, I think it's important to focus on the fact that we're not defending Keller. Not only did we discharge him, but he was also criminally prosecuted. You have a good argument with respect to Coleman. There's no doubt about that. Yes. Maybe a good argument with respect to Stoner, I don't know, but maybe not. Maybe that's something the jury has to sort out as well. I think we have no reason to believe, Your Honor, that Sergeant Stoner did anything in this case. I understand, and what Ms. Krupa is saying, that's an argument. You have to have more development of facts, and it's an argument that should be made to a jury. But as to Zosky and Mirai, it seems like it's pretty much a laid-down hand that the jury has to sort this out. Maybe Zosky gets off. He was just trying to tackle him and get this thing over with. But what was or what was not a punch thrown by Mirai really is not for us to sort out. I understand, Your Honor. That's where the case stands. The issue in this case is whether or not under Scott v. Harris you can look at this video and come to the conclusion that Magistrate Judge Lenihan did. I would emphasize, though, that there's no basis at all for supervisory liability in this case as to Sergeant Stoner or Lieutenant Wright based on alleged false statements or even if we grant that they must be false statements as to whether or not in Stoner's case he saw anyone striking Mr. Ringel because it's very clear, and the cases are cited in my brief at page 14, that a cover-up or false statements and reports after the event are not a basis for supervisory liability as to the exercise of excessive force. The supervisory liability has to have been the moving force that gave birth to the occurrence itself. It can't be any type of distasteful as it may be cover-up after the fact or failure to properly investigate it or anything like that. That is not supervisory liability for the use of excessive force, whatever else it might be. And as far as the four officers technically by formal regulation supposed to have been in the dining hall, I think there are two problems with causation. One is the fact that the purpose of the four officers is to ensure the safety of the inmates and the guards and to make sure that the dining hall properly functions according to the manner in which it's logistically organized. It's not to prevent a guard from running amok and a rogue guard from conducting an assault, which is what we think is an undisputed fact in this case. So those two issues, I believe, absolutely lack any basis. What was the internal claim against Mr. Ringgold? That he assaulted an officer? Or what? Pardon me? Was there any internal claim against Ringgold as to why? I don't believe so. I believe that he was ultimately determined, even in the earliest stages of the investigation, to have done nothing more than engage in self-defense. But people coming in on the situation aren't necessarily required to know anything  All they are required to do is to risk their own safety and lives to properly safeguard the inmate. And aside from Ringgold, I think that's what they did. Well, the question is, and I think we're talking about Soskin. Aside from Keller, I'm sorry. Yeah. We know we've got a pretty good idea who tackled and who threw punches. So you're left with Murai, Soskin, and Stoner as being there. Yes. And the question is, can they be subjected to liability for not preventing it or not ameliorating it? Reacting to you. And if that's the case, why is it not a jury question? Well, Your Honor, and I apologize for interrupting before, I don't think you have a jury question in any way except assuming you don't see it, and with every respect and deference to the court, assuming you don't see it the way Magistrate Judge Lenahan and we see it, Murai presents a material issue of fact as to whether or not he was striking unnecessary blows under the circumstances. But I don't think Soskin, who's just laying there under everyone, and Stoner, who does nothing but save Ringel from further unwanted punishment at the hands of Keller, there's any basis there. We can't speculate and say that all these terrible things that were done by other people happened during those seven seconds when there's no reason to think. They wouldn't have had any reason to know they were being afforded an opportunity they could exploit. They had no reason to know anything was happening to the camera. Then again, in the seven seconds, I mean, are we supposed to believe that within those seven seconds they flailed away at this helpless man and kicked him and did all these terrible things? There were witnesses there, and that may be a jury issue. I think that's a good segue to get Ms. Gruber back on rebuttal. Thank you, Your Honor. I appreciate your time and patience. Thank you. To answer Your Honor's question about the allegations that were made against Trevor Ringel after this incident, and I apologize, I don't have his entire deposition at my disposal, but there were claims after this immediate incident that he was the one that was the aggressor and that he was the one that was assaulting the officer. On page 22 of the record, he does testify in the deposition transcript, says that Keller, Zosky, Marai, and Stoner had made false accusations, and when he was asked about those, he said they claimed that I assaulted C.O. Keller, and the result was they put a big sign on my door that said, Assault of Torch Staff. And he had filed grievances which were denied. He did receive repercussions as a result of this incident within the DOC, even though he was the victim of the assault. Now, with respect to what each of these defendants saw. Was Mr. Ringel now? Mr. Ringel now has been transferred recently, and he was in Albion for some time, and I believe it's one of the SEIs. I can't say specifically which SEI he's at right now. He's been transferred within the last few weeks. How much more time does he have to serve? I don't recall the specific incident either. It's several years. Okay. Okay. With respect, though, and I apologize for the information, but with respect to what these particular defendants saw and did not see, most of them made written statements immediately after the incident. In Zosky's written statement, and again, you see Zosky, is his focus during the video shows that his focus is on this incident. In his written statement, he said he proceeded to assist CO Keller by preventing inmate Ringel from assaulting him. There's an argument, and obviously maybe it's an argument that needs to be made to a jury, that Zosky was just doing everything he could to try to get the thing to stop and break it up. He wasn't. He was tackling. That seems to be. I mean, what else could he have done? What could Zosky have done? In all fairness, I think what Stoner initially did was that he. . . Well, now, remember, Zosky tackled him, and then Merai comes in, and then Keller jumps over them and still resumes punching. I mean, obviously no one's defending Keller. But in Zosky's case, you know, you've got a split second to do something. There's an altercation that breaks up out. Forgetting who started it, he's trying to do his job to quell it. What else should he have done? I believe that he should have taken. . . And each of these COs have a duty to protect the inmate. He should have. . . Instead of holding Keller down. . . I'm sorry. Instead of holding Ringel down to suffer more blows by Keller, he should have taken steps to remove Keller. Actually, well. . . And I believe that that's appropriate for a jury. He wasn't hitting him. He was just trying to. . . I mean, at this point, they're both grappling with each other. When he comes in and from behind, he tackles. And, in effect, what he did was render Ringel. . . I think, you know, him and Wright together. . . Wasn't the best part of your case that supposedly Zosky said he didn't see anything? With respect to Zosky, yes. That all of these inmates are saying that they did not see Officer Keller or any officer assault Ringel. And I think, then, that that's circumstantial evidence that should be submitted to the jury to make a decision on whether Zosky was acting in good faith or whether he was acting in concert in conspiracy and furtherance of the Safe Amendment violation. Could you explain that conspiracy charge for me, please? With respect to what was being. . . Yeah, what is the genesis of the conspiracy charge? You know, these particular officers. . . In the amended complaint, it alleges specifically that Defendants Keller, Murai, Zosky, and Stoner acted in concert in conspiracy to deprive Trevor Ringel of his Eighth Amendment protections. I think the fact that Zosky held the inmate down while he was being assaulted and I think the fact that he lied afterwards to cover up the assault shows bad faith. I mean, it shows a consciousness of guilt. And I think that that is an issue that needs to go to the jury. It's not something that's properly granted on a summary judgment motion. Now, with Murai, Murai, again, has the same standpoint that he didn't see Officer Keller strike the inmate. But I do think. . . I'm sorry. It's okay. This would have been a conspiracy proved by concerted action? Yes. But certainly no discussion. No, I agree. I do not believe that this was something that was intentionally plotted and planned and carried out. I think that by their actions, they participated in the assault and by lying to cover up the assault. And this is one of the few instances where the OPR. . . Let me just probe that. Is that legally relevant to the conspiracy charge that they lied? They obviously lied about that. Yes, and I was not able to find any specific case on point, but I think it matters of public policy. The people that were named as defendants had some direct involvement in this issue other than Superintendent Coleman. And given the fact that they were witnesses and lied immediately after, lied months later, years later in their depositions, I think that that's a matter of public policy. It's something that should not be condoned. That it shows that they acquiesced and they tolerated this type of unlawful activity and that it should be submitted to the jury to sort out what each party's culpability is in this case. Before you step away, Stoner, what's the claim against him? He was not in that room. He's not in the room initially, so he did not. . . So he's not in the room initially and he comes in. The only thing we see on camera is he's immediately doing what you just said, you suggested Zosky should have done with respect to Keller, which is get him off of him. Correct. And we know from the point that Stoner, the defendant Stoner, grabs Officer Keller, that Officer Keller is actively striking this inmate while two other officers are holding him down. And nobody in the DOC is taking the position that Keller's actions were justified. But the fact remains that as Stoner approaches, Keller is brutally assaulting him in the face. . . And Stoner immediately tries to stop him. Stoner does. And then Stoner testifies in his written statement immediately thereafter. If it wasn't the same day, it was within a few days. I did not see any officer strike the inmate. And that maybe goes back to Judge Sirica's question. How is this guy part of any conspiracy? What did he do wrong?  That very well could be the truth. And I think that's an issue for the jury to decide. Well, at some point, yes, but there's a rule of reason here. Again, I was not able to find a specific civil rights case on point, but if you were to parallel it to a criminal world, you have accomplices after the fact who may not have been actively involved in the original criminal action, but when you lie to cover up for it afterwards, you can be . . . I'm not sure if that was a lie, was it? He didn't see anyone . . . Well, I guess he did see when he came into the room Keller hitting him. Is that right? Yes. But he immediately tried to stop it. Correct. But then if he was acting in good faith, why wouldn't he put in his report, you know, Officer Keller was striking the inmate in the head? Why not be truthful about that? I think that it's bad faith. I think that what's happened when the DOC . . . And again, this case would be . . . I don't think that I would have the privilege to stand in front of you today if the OPR hadn't taken the position that they did and that they moved to discipline Keller, that they moved the criminal charges to be brought. I think that had that not happened, that this internally would have been hushed up and we may or may not have that DVD. But because the OPR investigating officer was diligent in retrieving that, we have more evidence and are moving forward. However, I think that there's a . . . The fact that every single DOC employee involved in this case testifies that they didn't see any officer assault this inmate establishes that there's a custom and policy and a practice that within the DOC they cover up this type of unlawful activity. Thank you very much. Thank you. Thank you to both counsels. It was a very enlightening argument, and we'll take the matter under advisement. Thank you.